UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
DONNELL COLEMAN,

        *Petitioner*,

                                  **Memorandum and Order**

    -against-                    18-CV-4498(KAM)


JOSEPH H. NOETH,

        *Respondent*.
------------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

        Presently before the court is a petition brought by Donnell Coleman ("Mr. Coleman" or "Petitioner"), acting *pro se*, seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("Section 2254"). (*See generally* ECF No. 1, Petition for a Writ of Habeas Corpus ("Pet.").) Mr. Coleman challenges his conviction and sentence in the Supreme Court of the State of New York. Mr. Coleman was convicted of gang assault in the first degree, and sentenced to seventeen years in prison. Pursuant to that sentence, Mr. Coleman is currently incarcerated at Green Haven Correctional Facility in Stormville, New York.[1]

        For the reasons herein, Mr. Coleman's petition is respectfully DENIED in its entirety.

---

[1] At the time he filed his petition, Mr. Coleman was incarcerated at Attica Correctional Facility in Attica, New York.

## Background

### I.    Factual Background

In the early morning of November 27, 2010, Petitioner was with a group of several other people at a nightclub in Queens County, New York.  (ECF No. 6, Respondent's Opposition to Petition ("Opp."), at 12-13.)  According to the testimony of witnesses, a physical altercation broke out between Haroon Walfall ("Mr. Walfall") and four to six men, including Petitioner.  (*Id.* at 13-140.)  Shortly after the initial altercation ended, as Mr. Walfall was being escorted out of the nightclub, a group of eight to ten men attacked Mr. Walfall.  (*Id.* at 14-15.)  A large fight ensued that lasted for several minutes.  (*Id.* at 15-16.)  One of Mr. Walfall's cousins, who witnessed the incident, testified that after the fight was over, an unidentified individual who had been with Petitioner said, "That's what your cousin gets for dancing with somebody else's girlfriend."  (*Id.* at 17; *see* ECF No. 8, State Court Record, Trial Transcript ("Tr."), at 431.)

After the fight, nobody who witnessed the fight called the police.  (*See* Tr. at 378, 537, 686, 705, 932.)  According to one witness, Mr. Walfall "was a mess," and there was "blood everywhere."  (Opp. at 16.)  Later that morning, Mr. Walfall's cousin took Mr. Walfall to Franklin General Hospital in Valley Stream, New York.  (*Id.* at 17.)  Mr. Walfall died at the

2

hospital at 3:50 a.m.  (*Id.* at 17-18.)  An autopsy revealed that Mr. Walfall sustained at least eleven blows to the head, and that he had multiple blunt force injuries to his body.  (*Id.* at 18.)

Petitioner was arrested four months later in connection with the assault at the nightclub.  (*Id.* at 20.) Petitioner was charged with manslaughter in the first degree, gang assault in the first degree, gang assault in the second degree, and assault in the second degree.

## II.  The Trial

Petitioner's trial in Queens County Supreme Court began with jury selection on February 26, 2013.  Petitioner was tried along with Savann Hemmings ("Mr. Hemmings"), who was also accused of involvement in the assault on Mr. Walfall.

At trial, the prosecution's case consisted primarily of the testimony of eyewitnesses, including bouncers and nightclub patrons.  The prosecution's theory of the case was that Petitioner attacked Mr. Walfall because Mr. Walfall had been dancing with Petitioner's girlfriend.  Two witnesses testified that they saw Petitioner involved in the initial altercation with Mr. Walfall.  (Tr. at 688-89, 862.)  One witness who saw that incident was unable to say whether Petitioner was involved.  (*Id.* at 662.)  Mr. Walfall's cousin testified that Petitioner initiated the subsequent fight by

punching Mr. Walfall (*id.* at 344-45), and another witness testified that during that fight, Petitioner was an "aggressor" who was "kicking and punching [Mr. Walfall] violently" (*id.* at 675-77).

The prosecution also elicited testimony from Dr. Brian O'Reilly ("Dr. O'Reilly"), the Deputy Chief Medical Examiner of the Nassau County Medical Examiner's Office, who performed the autopsy on Mr. Walfall. (*Id.* at 440-46.)  Dr. O'Reilly described the victim's various injuries, which were primarily external. (*Id.* at 445, 447, 450.)  It was Dr. O'Reilly's opinion that if the victim had lived, none of his injuries would have required him to remain in the hospital. (*Id.* at 494.)

Dr. O'Reilly determined that the victim suffered from a mild form of idiopathic hypertrophic cardiomyopathy ("IHC"), or an enlarged heart. (*Id.* at 450, 494, 496.)  Dr. O'Reilly testified that IHC can lead to sudden death, especially after physical activity, and is the leading cause of heart-related deaths for people under 30. (*Id.* at 496—97.)  Dr. O'Reilly further testified that the victim died from cardiac dysrhythmia or heart attack following blunt force injury to his head, torso, and extremities, with qualifying conditions of IHC and sarcoidosis. (*Id.* at 476—78.)  Specifically, Dr. O'Reilly testified that "the blunt trauma would have caused [the victim] to become excitable, heart rate increased, blood pressure would

4

have increased and that precipitated his heart to go into a dysrhythmia." (*Id*. at 481.)  Dr. O'Reilly also testified that the victim would not have died from his injuries but for having IHC.  (*Id*. at 478.)  Thus, Dr. O'Reilly determined that IHC was not the immediate cause of the victim's death, but was a contributing factor.  (*Id*. at 476—78.)

During Dr. O'Reilly's testimony, the prosecution introduced into evidence photographs from the victim's autopsy, including a photograph of the victim's bloodied head with his scalp partially removed.  (*Id*. at 450—52, 465.)  Petitioner's counsel objected to admission of the photograph on the ground that its prejudicial impact outweighed its probative value. (*Id*. at 452—53.)  The state court trial judge allowed the photograph to be introduced, because it showed the hemorrhage within the muscle, which the jury might use to determine if the fight resulted in a serious injury.  (*Id*. at 454.)  Petitioner did not object to the introduction of any of the other autopsy photographs that were introduced into evidence.  (*Id*. at 455.)

Petitioner's key piece of evidence at trial was surveillance video from outside the entrance to the nightclub. (*See* Opp. at 20.)  The video showed Petitioner leaving the nightclub at 2:30 a.m., after several people had exited.  (*Id*.) Petitioner then re-entered the nightclub at 2:32 a.m., retrieved a shirt or a jacket, and walked back out.  (*Id*.)  Petitioner's

counsel argued that the video showed Petitioner being ejected from the nightclub after the initial altercation, and then calmly returning to retrieve his coat, which did not comport with the actions of somebody who allegedly committed a violent assault. (Tr. at 1024—25.)

During the prosecution's summation, the prosecutor argued to the jury that the case was about Petitioner "taking umbrage that somebody would have the audacity to dance with his girlfriend." (*Id.* at 1038.) The prosecutor stated that Petitioner felt it was "[n]ot okay for his property, not okay for his cattle" to dance with someone else. (*Id.*) Petitioner's counsel objected immediately after the prosecutor's "cattle" comment, which was sustained, and the judge told the jury to disregard the statement. (*Id.* at 1039.)

At the conclusion of trial, the jury convicted Petitioner of gang assault in the first degree, and acquitted him of the other charges. (Opp. at 3.) Petitioner's co-defendant, Mr. Hemmings, was convicted of assault in the third degree. (*Id.*) On July 11, 2013, the state court sentenced Petitioner as a second violent felony offender to a term of imprisonment of eighteen years, to be followed five years of post-release supervision. (*Id.*)

### III. Post-Conviction Proceedings

Petitioner, through assigned counsel, appealed his
conviction and sentence to the Appellate Division, Second
Department.  *See generally* Brief for Defendant-Appellant, *People
v. Coleman*, 148 A.D.3d 717 (2d Dept. 2017); (ECF No. 11-1).
First, Petitioner argued on appeal that the jury's acquittal of
the first-degree manslaughter charge demonstrated that the
evidence was not legally sufficient to show either that: (1) he
had the intent to cause serious physical injury, or (2) he
actually caused serious physical injury.  (*Id.* at 19-27.)
Second, Petitioner argued that the verdict was against the
weight of the evidence.  (*Id.* at 27-31.)  Third, Petitioner
argued that the prosecutor's remarks during summation, that the
case was about Petitioner "taking umbrage that somebody would
have the audacity to dance with his girlfriend" and thought it
was improper for his "cattle" to dance with someone else,
prejudiced the jury.  (*Id.* at 31-32.)  Fourth, Petitioner argued
that the trial court improperly allowed the jury to view the
autopsy photograph of the victim.  (*Id.* at 33-37.)  Finally,
Petitioner argued that he was improperly sentenced as a second-
time violent felon.  (*Id.* 38-45.)

In a decision dated March 1, 2017, the Appellate
Division rejected the majority of Petitioner's arguments.  *See
generally People v. Coleman*, 148 A.D.3d 717 (2d Dept. 2017).

The Appellate Division agreed with Petitioner regarding his
sentence, holding that Petitioner "was improperly sentenced as a
second violent felony offender," because his prior conviction
for possession of a weapon in the third degree did not count as
a violent offense.  *Id.* at 718-19.  The case was remanded to the
trial court for re-sentencing.  *Id.* at 719.

Petitioner sought leave to appeal to the New York
Court of Appeals.  *See generally* Leave Application for
Petitioner, *People v. Coleman*, 29 N.Y.3d 1077 (2017).  In his
application, Petitioner asked for the Court of Appeals to review
all of the claims that he raised to the Appellate Division.  On
June 26, 2017, the Court of Appeals denied Petitioner's
application.  *People v. Coleman*, 29 N.Y.3d 1077 (2017).

On May 2, 2017, Petitioner appeared before the Queens
County Supreme Court for re-sentencing.  The court imposed a
sentence of seventeen years of imprisonment, one year less than
his original sentence, and five years of post-release
supervision.  (Opp. at 7.)

Petitioner moved to reduce his sentence in the
Appellate Division.  *See generally* Leave Application for
Petitioner, *People v. Coleman*, 162 A.D.3d 787 (2d Dept. 2018).
On June 13, 2018, the Appellate Division denied his motion.
*People v. Coleman*, 162 A.D.3d 787 (2d Dept. 2018).  On September

18, 2018, the Court of Appeals denied Petitioner's request for leave to appeal. *People v. Coleman*, 32 N.Y.3d 1002 (2018).

### IV.  The Instant Habeas Petition

Proceeding *pro se*, Petitioner filed the instant petition on August 6, 2018 for a writ of habeas corpus pursuant to Section 2254.  Petitioner raised many of the same claims that he previously raised before the Appellate Division: (1) that the jury's verdict was not supported by legally sufficient evidence and was against the weight of the evidence; (2) that the admission of the autopsy photograph deprived him of a fair trial; (3) that the prosecutor's "taking umbrage" and "cattle" statements during summation deprived him of a fair trial, and his lawyer failed to properly raise the issue on appeal; and (4) that his original sentencing as a second violent felony offender was improper.[2]  Respondent opposed the petition.  (ECF No. 6.) Petitioner subsequently filed a memorandum of law, which focused largely on his arguments regarding the sufficiency and weight of the evidence, and which the court will treat as if it were his reply brief to Respondent's opposition.  (ECF No. 11, Memorandum of Law in Support of Petition ("Reply").)

---

[2] In his petition, Mr. Coleman raises his sentence as the third ground for relief, and the prosecutor's statements as the fourth ground. However, the court will reverse the order and discuss the sentencing last, and discuss the various stages of the state trial court proceedings in the temporal order that they occurred.

## **Legal Standard**

Pursuant to Section 2254, a federal district court shall issue a writ of habeas corpus to an individual in state custody "only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a).  A court may only issue such a writ if the state court adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see also Lindstadt v. Keane*, 239 F.3d 191, 198 (2d Cir. 2001).

In reviewing the instant petition, the court is mindful that Mr. Coleman is proceeding *pro se*, and thus reviews his petition "with a lenient eye." *Williams v. Kullman*, 722 F.2d 1048, 1050 (2d Cir. 1983); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is 'to be liberally construed,' and a '*pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).  Therefore, the Court interprets the petition as raising the strongest arguments it suggests. *Harris v. Mills*,

572 F.3d 66, 72 (2d Cir. 2009); *see also Martin v. United States*, 834 F. Supp. 2d 115, 119 (E.D.N.Y. 2011) (citing *Williams*, 722 F.2d at 1050).

## Discussion

### I. Ground One: Sufficiency of the Evidence

Petitioner first argues that the evidence at trial "was legally insufficient to prove guilt of first-degree gang assault," and the "verdict was against the weight of the evidence." (Pet. at 5-6.) Petitioner also made these arguments to the Appellate Division, which rejected them on the merits, "find[ing] that [the evidence] was legally sufficient to establish [Mr. Coleman]'s guilt of gang assault in the first degree," and "that the verdict of guilt was not against the weight of the evidence." *Coleman*, 148 A.D.3d at 717. Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), claims adjudicated on the merits in state court are not to be disturbed unless the were "contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see Sellan v. Kuhlman*, 261 F.3d 303, 308 (2d Cir. 2001) (AEDPA "mandates deference to state court decisions").

Moreover, "[i]t is well established that 'weight of the evidence' claims are not cognizable on federal review . . . ." *Durden v. Greene*, 492 F. Supp. 2d 414, 419 (S.D.N.Y.

2007); *see also Bey v. Chappius*, 2019 WL 4805401, at *3 n.2
(E.D.N.Y. Sept. 30, 2019) ("Thus, a challenge to the weight of
the evidence concerns 'an error of state law, for which habeas
review is not available,' because it presents no federal
issue.") (quoting *Douglas v. Portuondo*, 232 F. Sup. 2d 106, 116
(S.D.N.Y. 2002)).  Petitioner's "challenge to the legal
sufficiency of the evidence," however, "is cognizable upon
habeas review." *Durden*, 492 F. Supp. 2d at 420.

Sufficiency of the evidence claims in federal habeas
cases "face a high bar," because they are subject to two layers
of judicial deference. *See Coleman v. Johnson*, 566 U.S. 650,
651 (2012).  First, "evidence is sufficient to support a
conviction whenever, 'after viewing the evidence in the light
most favorable to the prosecution, *any* rational trier of fact
could have found the essential elements of the crime beyond a
reasonable doubt.'" *Parker v. Matthews*, 567 U.S. 37, 43 (2012)
(quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).
Second, a "state-court decision rejecting a sufficiency
challenge may not be overturned on federal habeas [review]
unless the 'decision was objectively unreasonable.'" *Id*.
(quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)).

When reviewing a sufficiency of the evidence claim,
"[a] federal court must look to state law to determine the
elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91,

97 (2d Cir. 1999).  For an individual to be convicted of gang assault in the first degree under New York law, the prosecution must prove that the defendant acted "with intent to cause serious physical injury to another person and [was] aided by two or more other persons actually present, [and] he cause[d] serious physical injury to such person or to a third person." N.Y. Penal Law § 120.07.  A "serious physical injury" includes death, a substantial risk of death, or serious protracted disfigurement, impairment of health, or loss or impairment of bodily function.  N.Y. Penal Law § 10.00(10).

This court acknowledges that the evidence at Petitioner's trial was, in some respects, inconsistent.  As one might expect in the case of witnesses who were attempting to recall a chaotic event that took place years earlier in the early morning hours at a nightclub, the testimony did not paint a perfectly clear picture of events.  But the court is obliged to review the evidence in a light most favorable to the prosecution.  In so doing, the court agrees with the Appellate Division's determination that there was sufficient evidence for a reasonable jury to find that Petitioner acted with intent and with others to cause serious physical injury to Mr. Walfall. *See Coleman*, 162 A.D.3d at 717—18.

First, a rational trier of fact could have concluded that Petitioner intended to cause serious injury to the victim.

13

The trial evidence included witness testimony that Petitioner punched, kicked, and stomped on the victim. (Tr. at 345—46, 673.) One bouncer described Petitioner as an "aggressor," kicking and punching the victim violently. (*Id.* at 676—77.) Thus, the jury was within its discretion to determine that Petitioner intended to cause serious injury to the victim. Even if Petitioner left at some point during the fight and only returned to retrieve his jacket, the testimony regarding his earlier actions, including that he was an "aggressor" in the fight, was sufficient for a reasonable jury to determine that he was acting with intent to cause serious injury.

Second, a rational trier of fact could have found that Petitioner acted in concert with at least two other people who were actually present during the assault. Petitioner argues that, because his co-defendant was convicted only of assault, but acquitted of gang assault, the two of them could not have acted in concert. (Reply at 18.) But the trial evidence, including accounts from several victims, established that Petitioner and approximately ten other men punched and kicked the victim throughout the fight. (Tr. at 345—46, 660, 673, 675—76, 712, 724, 848—51, 886, 893, 909.) A patron described "one big wall of fighting," and "pandemonium . . . [where] everyone [was] throwing blows." (*Id.* at 660.) This testimony was

sufficient to establish that Petitioner acted in concert with at least two others who were present.

Finally, a rational trier of fact could have found that the victim suffered a serious injury.  The injury threshold for a "serious physical injury" must rise to the level of being "reasonably substantial." *See, e.g.*, *People v. Askerneese*, 93 N.Y.2d 884 (1999) (victim sustained a serious injury where he received a deep puncture wound in his upper lip that caused nerve damage, numbness, and lack of control for his upper lip). Here, testimony at trial established that, following the fight, the victim was "a mess" with "blood everywhere," including on his shirt and in his vicinity on the floor.  (Tr. at 661.)  The victim's cousin observed that the victim was "bleeding a lot" from his mouth, nose, eyes, and the back of his head.  (*Id.* at 348, 396.)  One bouncer observed that the victim appeared "groggy" and "mumbling," while another observed that the victim's eye was bloodshot and his nose was bleeding.  (*Id.* at 679, 707, 717, 852.)  As the victim's cousin walked the victim to his car, he observed that the victim was barely conscious and moaning.  (*Id.* at 350.)  In his testimony, Dr. O'Reilly stated that the victim sustained at least eleven blows and multiple blunt force injuries to his body, consistent with being punched, kicked, stomped, and thrown to the floor.  (*Id.* at 445–50, 457– 59, 489–90.)  The victim's injuries included multiple bruises,

contusions, and lacerations on his face and body, including a half-inch laceration on the back of his head that would have required stiches.  (*Id*. at 447–48, 456, 460–61, 463, 486–87.)

Petitioner asserts that, given Mr. Walfall's medical condition, it was impossible for the prosecution to prove that any injuries sustained during the fight caused his death.  (Pet. 16-17.)  But Petitioner was not convicted of murder or manslaughter; he was convicted of gang assault.  The prosecution was not required to prove that the assault caused the victim's death, only that it caused "serious physical injury."  From the totality of the evidence, a reasonable jury could conclude that the attack against Mr. Walfall caused serious physical injury.

Accordingly, the Appellate Division did not reach an objectively unreasonable decision.  Rather, the Appellate Division granted appropriate deference to the jury's determination of the facts, and found that the verdict was supported by sufficient evidence.  Petitioner's challenge to the sufficiency of the evidence is, therefore, rejected.

## II.    Ground Two: Admission of the Autopsy Photograph

Petitioner next argues that the "admission [at trial] of a disturbing bloody autopsy photograph of the victim's skull with the scalp removed" deprived him of a fair trial.  (Pet. at 7.)  This claim was also considered, and rejected, by the Appellate Division, which held that "[t]he challenged photograph

16

was neither excessively gruesome nor introduced solely for the purpose of arousing the jurors' passions and prejudicing the defendant . . . ." *Coleman*, 148 A.D.3d at 718. "Rather, the photograph was relevant to help illustrate and corroborate the testimony of the medical examiner regarding the cause of death . . . ." *Id.* As the medical examiner testified, the victim's injuries suffered during the fight, coupled with his enlarged heart, caused his death. (Tr. at 476-78.) The state appellate court's determination is entitled to deference under the AEDPA. *See Sellan*, 261 F.3d at 308.

     "State trial court evidentiary rulings generally are not a basis for habeas relief." *Oliver v. Kirkpatrick*, No. 06-cv-6050, 2012 WL 3113146, at *6 (E.D.N.Y. July 31, 2012) (citing *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir.2012)). "Even if unfairly prejudicial evidence was erroneously admitted at trial, to amount to a denial of due process, the evidence must have been sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Id.* (quotation and alterations omitted).

     Here, the court agrees that the autopsy photograph was probative, because it was relevant to Dr. O'Reilly's testimony about the extent of the victim's injuries. As discussed above, the extent of the victim's injuries was an essential element of the crime for which Petitioner was convicted. The state trial

17

court made a determination regarding the admissibility of the photograph, which the Appellate Division upheld.  Even if this court disagreed with the trial court's decision regarding the admissibility of the photograph, in order to grant a writ of habeas corpus, this court would have to find that the photograph "was 'so extremely unfair that its admission violated fundamental conceptions of justice.'"  *Sandoval v. Lee*, No. 14-cv-5187, 2016 WL 2962205, at *5 (E.D.N.Y. May 20, 2016) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)) (alterations omitted).

Based on the other evidence against Petitioner, the court cannot find that the introduction of a single photograph violated his constitutional right to a fair trial.  This claim is therefore, likewise, rejected.

**III.   Ground Three: Prosecutor's Statements During Summation**

Petitioner also argues that he was denied a fair trial because the prosecutor, during summation, stated that the case was about Petitioner "taking umbrage that somebody would have the audacity to dance with his girlfriend," and that Petitioner believed it was "[n]ot okay for his property, not okay for his cattle" to dance with someone else.  (Tr. at 1038; *see* Pet. at 10.)  The Appellate Division found that arguments about the summation were not preserved, because Petitioner "failed to object to the statements."  *Coleman*, 148 A.D.3d at 718.

18

Nonetheless, the Appellate Division held that, on the merits, "the prosecutor's statements in his summation, for the most part, constituted fair comment on the evidence and the inferences to be drawn therefrom . . ., and any improper statements were not 'so flagrant or pervasive' as to deprive [Petitioner] of a fair trial." *Id.* (quoting *People v. Almonte*, 23 A.D.3d 392, 394 (2d Dept. 2005)).  Petitioner asserts in his petition that his counsel rendered ineffective assistance by failing to properly present the issue on appeal (Pet. at 11), and notes in his reply brief that his trial counsel did, in fact, object to the prosecutor's summation (Reply at 7-8).

Petitioner's claim that the prosecutor's summation violated his rights would generally be barred because the Appellate Division held that it was not preserved for appellate review.  Where a state court finds that a claim is procedurally barred, federal habeas review is barred.  *See Harris v. Reed*, 489 U.S. 255, 262 (1989) ("[A]n adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a

fundamental miscarriage of justice.") (quotations and citations omitted).

Here, the trial transcript reveals that Petitioner's counsel did object immediately after the prosecutor used the word "cattle." (Tr. at 1039.) The trial court sustained the objection, and instructed the jury to "disregard" the statement. (*Id.*) Thus, Petitioner's argument that the summation violated his rights appears to have been preserved, and is not barred. Petitioner's argument fails on the merits because there was no error in the trial court's handling of the prosecutor's statement. The prosecutor's suggestion, without evidence, that Petitioner viewed his girlfriend as "cattle" was unfortunate, but the trial judge sustained defense counsel's objection and promptly instructed the jury to disregard the statement. "As the Supreme Court has frequently observed, the law recognizes a strong presumption that juries follow limiting instructions." *United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006). Thus, because the judge provided a limiting instruction to the jury, Petitioner's rights were not violated by the summation.

To the extent Petitioner now claims that he was rendered ineffective assistace of counsel because his appellate counsel failed to show that the issue was preserved on appeal, he must meet the "highly demanding" standard set forth in *Strickland v. Washington*, 466 U.S. 688 (1984). *See Kimmelman v.*

*Morrison*, 477 U.S. 365, 382 (1986).  The court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 89; *see also United States v. Cohen*, 427 F.3d 164, 167 (2d Cir. 2005).

Under *Strickland*'s two-prong test for ineffective assistance of counsel, habeas petitioners must demonstrate (1) that "counsel's representation fell below an objective standard of reasonableness," and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 703.  If a petitioner fails to meet one prong, the court need not consider the other.  *See Parker v. Ercole*, 666 F.3d 830, 834 (2d Cir. 2012).

The Appellate Division's opinion makes clear that, even if appellate counsel had properly shown that the issue regarding the prosecutor's statements during summation was preserved for appellate review, it would not have changed the outcome of the appeal.  The Appellate Division found it unpreserved, but nonetheless addressed the issue on the merits, holding that "the prosecutor's statements in his summation, for the most part, constituted fair comment on the evidence and the inferences to be drawn therefrom . . ., and any improper

21

statements were not 'so flagrant or pervasive' as to deprive [Petitioner] of a fair trial." *Coleman*, 148 A.D.3d at 718. Thus, even if the issue had been properly presented, the Appellate Division made clear it would have rejected the issue. Any error on the part of Petitioner's counsel was therefore immaterial to the outcome of the appeal, and so Petitioner's claim fails the second prong of the *Strickland* test.

Petitioner's contention that his conviction must be vacated because of the prosecutor's statements during summation is thus rejected.

## IV.    Ground Four: Sentencing

Finally, Petitioner argues that his "adjudication as a second violent felony offender" was "illegal." (Pet. at 9.) As discussed above, Petitioner raised this argument on appeal, and the Appellate Division agreed and remanded his case to the trial court for re-sentencing. *See Coleman*, 148 A.D.3d at 718-19. On remand, Petitioner was re-arraigned as a second non-violent felony offender, and re-sentenced to seventeen years in prison, rather than eighteen years in prison. (Opp. at 7.) Thus, Petitioner's argument is effectively moot.

"An excessive sentence claim may not provide grounds for habeas corpus relief where a petitioner's sentence is within the range prescribed by state law." *Taylor v. Connelly*, 18 F. Supp. 3d 242, 268 (E.D.N.Y. 2014); *see also White v. Keane*, 969

F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issues is presented where, as here, the sentence is within the range prescribed by state law."). Here, Petitioner was convicted of gang assault in the first degree, which under New York law is a class B violent felony. N.Y. Penal Law § 70.02(1)(a); *see* N.Y. Penal Law § 120.07. The sentence for a class B violent felony, without any enhancement for a prior violent felony offense, must be "at least five years and must not exceed twenty-five years . . . ." N.Y. Penal Law § 70.02(3)(a).

Mr. Coleman's sentence of seventeen years was within the range allowed under state law, and thus did not violate his constitutional rights. Any claims that he could have raised or did raise regarding his sentence are, therefore, rejected.

## Conclusion

For the foregoing reasons, Mr. Coleman's Section 2254 petition is DENIED and dismissed in its entirety. Because Mr. Coleman has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (discussing certificate of appealability standard); Rules Governing Section 2254 and 2255 Cases, Rule 11 ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.").

The Clerk of Court is respectfully directed to enter judgment in favor of Respondent, serve Mr. Coleman with a copy of this Memorandum and Order and the judgment, note service on the docket, and close this case.

**SO ORDERED.**

Dated:    Brooklyn, New York
          August 14, 2020

                              _____/s/_____
                              Hon. Kiyo A. Matsumoto
                              United States District Judge